**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

TAMMI BROOKS, as Mother and
Legal Guardian of
QUINECIA BROOKS, a minor,

      Plaintiff,

    v.

CLAYTON COUNTY, GEORGIA, et al.,

      Defendants.

CIVIL ACTION NO.
1:07-CV-0555-JOF

## OPINION AND ORDER

This matter is before the court on Defendants' motion for leave to file excess pages [22] and Defendants' motion for summary judgment [23].

**I.    Background**

    **A.    Complaint**

Plaintiff, Tammi Brooks, in her capacity as mother and legal guardian of Quinecia Brooks, filed this section 1983 action against Defendants Clayton County, Georgia, Sheriff Victor Hill, and Sergeant Bobby Lane on March 9, 2007. Plaintiff amended her complaint on July 11, 2007. Plaintiff's complaint is not a model of clarity and is an example of "shot gun"pleading in that it does not associate any causes of action with any particular

Defendant. Essentially, Plaintiff complains that on July 26, 2005, Defendant Lane improperly entered the Brooks' home and used excessive force while falsely imprisoning and falsely arresting Quinecia.

Plaintiff lists her first cause of action as "constitutional deprivations." *See* Amended Cmplt., ¶¶ 10-22. In this section of her complaint, Plaintiff utilizes the terms false arrest, false imprisonment, excessive force, "government tyranny, unreasonable search and seizure, arrest without probable cause, excessive use of force, and arrest and prosecution without due process of law." *Id.* It is in this section of her complaint that Plaintiff alleges the acts were committed pursuant to a custom, policy, or pattern of Clayton County and its Sheriff's Department. *Id.*, ¶ 20. Plaintiff alleges that Defendants failed to properly supervise Defendants, failed to enact sufficient policies to prevent unreasonable searches and seizures or the use of unnecessary force, tolerated unconstitutional policies, and failed to properly investigate employees. *Id.* Plaintiff concludes her "first cause of action" by stating that Defendants acted in violation of her Fourth, Fifth, Sixth, and Fourteenth Amendment rights. *Id.*, ¶ 21.

In her "second cause of action," Plaintiff alleges violations of the Equal Protection Clause, arguing that Defendants singled her out because of her race. *Id.*, ¶¶ 23-24. Plaintiff then raises state law causes of action of false imprisonment, aggravated assault and battery, simple assault and battery, false arrest, and illegal search and seizure. *Id.*, ¶¶ 25-32.

2

Plaintiff seeks $1,000,000 in compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1988, as well as injunctive relief barring the described searches and seizures and requiring the disciplining of Defendant Lane.

**B.     Facts**

1. Incident of July 26, 2005

Defendant Lane works in the Field Division of the Clayton County Sheriff's Office serving criminal warrants and civil papers. On July 26, 2005, Defendant Lane received arrest warrants for service. One of those warrants was for Dynolis Williams Murphy, described as a black female, five feet eight inches tall, and 150 pounds, aged 36. The arrest warrant listed her address as 320 Rocky Springs Court, College Park, GA, 30349-0109. Shortly before 5:00 p.m., Defendant Lane drove to 320 Rocky Springs Court and approached the house. He heard a female talking. When he rang the doorbell, Defendant Lane testified that a black female approximately five feet eight inches tall and 160 pounds looked out the front door and made eye contact with him. The person he saw was actually Quinecia Brooks, a thirteen-year-old black female who was five feet seven inches tall and 200 pounds at the time of the incident.

As the court must take the facts in the light most favorable to Plaintiff, the court refers to Quinecia Brooks' deposition testimony to describe what happened next. Quinecia testified that Defendant Lane banged on the door. *See* Quinecia Depo., at 15. She opened

3

the door and he was in front of it. *Id.* Defendant Lane introduced himself and said that he was Sergeant Lane. He was from the Clayton County Sheriff's Department. *Id.* at 16. She continued to state that "[a]utomatically I had closed – I got scared and I had told him I had to call my mother because my mom told me not to open the door for anyone. So as I tried to close the door, he placed his foot inside the door so I couldn't close the door on him." *Id.* at 16-17. "Then he walked in the door, threw me on the ground, placed me in handcuffs and also he was yelling something about I closed his leg in the door and I was crying." *Id.* at 17. "Then as I was already handcuffed, he pulled and pointed a [taser] gun at me; and then the phone kept ringing over and over." *Id.*[1] Defendant Lane would not allow her to answer the phone. *Id.* (Several pages later in the deposition, Quinecia clarifies that it was a taser gun that Defendant Lane pointed at her. *Id.* at 19.)

Defendant Lane then asked Quinecia her name and date of birth which she gave him. *Id.* at 17. He called in the name to see whether there were any outstanding warrants. *Id.* at 18. The operator told Defendant Lane there were no warrants. *Id.* Defendant Lane told Quinecia "to get up off the ground, floor in my house while I was in handcuffs and turn around. He told me to turn around so he can check me for fingerprints, see if I had – he pulled out his flashlight and checked my hands. After that he's saying it wasn't nothing on

---

[1] The court notes that in her briefs, Plaintiff repeatedly refers to the fact that Defendant Lane put his taser gun to her head. Quinecia's deposition testimony does not support such a gloss. Rather, she testified that Defendant Lane "pulled the [taser] gun out on me." *See* Quinecia Depo., at 26.

4

my hands. He say my hands were clear, and he uncuffed me and told me to call my mother." *Id.* Quinecia's mother said she would come home. *Id.* at 21. Quinecia then called a friend of hers from down the street to tell him what happened, but he did not actually come up to the house. *Id.*

Quinecia and Defendant Lane walked outside to wait for her mother. *Id.* Quinecia was not present during the conversation between Defendant Lane and Tammi because she had gone to talk to another friend who arrived. *Id.* at 26. Quinecia stated that she injured her thigh because part of the steps were not built and her legs were dangling off the floor. She further stated she had seen a psychiatrist because of the incident. *Id.* at 24.

When Tammi Brooks arrived, Defendant Lane explained what had happened, including that he could have charged Quinecia with simple assault. During this conversation, Tammi also told Defendant Lane that mail with Murphy's name on the address regularly came to the house. *See* Tammi Brooks Depo., at 27. Defendant Lane gave Tammi his business card with his county-issued Nextel cell phone number on the card. Tammi called Defendant Lane later that evening and stated that certain facts about the incident did not make sense, and she felt that it was not appropriate to threaten to shoot Quinecia with a Taser gun because she was a juvenile. Defendant Lane explained the incident to Tammi again and stated that he believed Quinecia was a threat at the time she closed the door on

him and did not know at that point that she was a minor. Defendant Lane also told Tammi that she could file a complaint if she wished.

It is undisputed that Defendant Lane did not use the Taser gun, nor did he pull out his service revolver. It is also undisputed that Quinecia was in handcuffs for at most ten to twenty minutes (*see* Quinecia Depo., at 25), and her mother returned to the home within a half hour. *See* Quinecia Depo., at 25 (saying mother was home within fifteen minutes) and Tammi Depo., at 15 (saying it took her thirty minutes to arrive home). Captain Jon Antoine of the Internal Affairs Division of the Clayton County Sheriff's Office reviewed the incident and determined that Tammi's complaint was unfounded.

### 2. Facts Related to Arrest Warrant

Defendant Lane had an arrest warrant dated June 7, 2005. *See* Lane Depo., Exh. 1. The warrant listed the address, home phone number, cell phone number, height, weight, race, and date of birth of Dynolis Williams Murphy. *Id.* It also gave a description of the vehicle she drove. *Id.* The complaint described that Ms. Murphy embezzled $12,700 from a Cash N Go, Inc., store in College Park, Georgia. *Id.* A judge of the Clayton County magistrate court certified that probable cause did exist for the issuance of an arrest warrant on June 20, 2005. *Id.* On July 26, 2005, Sheriff's Service Clerk C. Canady informed Defendant Lane that no attempt on the warrant had been made previously, but that the victim

6

had called that afternoon and told the clerk that Ms. Williams was at home. *See* Lane Depo., Exh. 4.

Defendant Lane testified that when he went to serve the warrant he also would have had a printout of the law enforcement screen for Ms. Murphy as well as any criminal history information. *See* Lane Depo., at 15. Defendant Lane served the warrant on Ms. Murphy about a week later at a different address that Defendant Lane had learned from using the previous addresses listed on the warrant. *Id.* at 16-17. Although that address was vacant, Defendant Lane talked to a neighbor who said that Ms. Murphy had lived around the corner and told him what kind of vehicle she drove. *Id.* at 17-18. Defendant Lane went to that address, confirmed with Ms. Murphy's husband that she lived there and left his card. *Id.* at 18. When she did not come to turn herself in, he returned to the house and later made the arrest. *Id.* On the day Defendant Lane arrived at Plaintiff's house, he had not tried to call any of the phone numbers listed on the warrant. *Id.* at 22. Defendant Lane testified that his usual practice is to start at the address listed on the warrant, unless information in the warrant file leads him to a different place. *Id.* at 23-24.

### C. Contentions

Defendants argue that all state law claims against Clayton County should be dismissed under the doctrine of sovereign immunity. Defendants further contend that there is no evidence that Plaintiff suffered a harm as a result of an unconstitutional County policy

7

nor that Clayton County had any control over officers of the sheriff's department. Finally, Defendants argue that Defendants Lane and Hill in their individual capacities are entitled to qualified immunity, and Plaintiff did not adduce evidence of excessive force. With respect to Plaintiff's state law claims, Defendants argue they are barred by official immunity, or in the alternative, the court should decline to exercise supplemental jurisdiction over them.

Plaintiff argues that Defendants cannot justify their actions because it constituted a warrantless search of the home without exigent circumstances. Plaintiff avers that Clayton County has waived its sovereign immunity through the purchase of liability insurance. Plaintiff also asserts that she suffered harm as a result of the policies of Clayton County because they allowed entry into a third party's home on the basis of an arrest warrant. Plaintiff contends that the individual Defendants are not entitled to qualified immunity because the law regarding arrest warrants and third party residences was clearly established. Plaintiff argues that the allegations of forced entry, throwing to the floor, handcuffing, holding down, and pointing of the taser are sufficient to establish her excessive force claim. Plaintiff contends that the court should not decline to exercise supplemental jurisdiction over her state law claims because they arise out of the common nucleus of operative facts and that Defendants would not be entitled to official immunity under state law because their acts

8

were not discretionary and were wilful and wanton. Finally, Plaintiff contends that it is she who is entitled to summary judgment despite the fact that she did not file such a motion.

**II.     Discussion**

   **A.     Preliminary Matters**

It should be axiomatic by this point that the key to analyzing a section 1983 claim is identifying the constitutional violation at issue. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (court must first determine whether plaintiff's allegations, if true, establish a constitutional violation); *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007) ("As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated.") (citation and quotation omitted). Neither Plaintiff nor Defendants, however, have been particularly helpful in this area. The court recognizes that the ordering of the analytical steps in a § 1983 case is no longer mandatory, but rather the district court has the discretion to decide whether to first address the constitutional violation or the issue of qualified immunity. *See Pearson v. Callahan*, ___ U.S. ___ (2009).

Plaintiff does contend in her briefing that she suffered from a false arrest because Defendant Lane forced entry into the home with no legal reason, threw Quinecia to the floor, handcuffed her, and put a taser to her head. With respect to these contentions, it is important to distinguish the arguments of counsel from the evidence adduced in the record. As the court noted above, Quinecia, herself, testified that she opened the door to Defendant Lane

9

and therefore, he did not force himself into the home prior to their interaction. Further, Quinecia also testified that Defendant Lane pulled out the taser, but she never stated that he pointed the taser at her head. The court addresses below the implications of the fact that the person sought in the warrant did not actually live at Quinecia's address.

Thus, the court turns to the crux of the issue for the purpose of analyzing the false arrest claim, that is, whether the investigatory detention here crossed the line into an "arrest." The Eleventh Circuit explained in *United States v. Perez*, 443 F.3d 772 (11th Cir. 2006), there are "three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *Id.* at 777. The first category does not implicate the Fourth Amendment. *Id.* (citing *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986)). The second category "involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave." *Id.*; *see also United States v. Mendenhall*, 446 U.S. 544, 555 (1980) (seizure occurs for Fourth Amendment purposes "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained"). When "the totality of the circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required." *Perez*, 443 F.3d at 777.

AO 72A
(Rev.8/82)

Here, based on the allegations in the complaint, a reasonable person in Quinecia's position would not have believed that she was free to leave. The court must determine, then, whether the investigatory detention crossed the line into an "arrest" such that Quinecia could pursue a "false arrest" claim. To do so, the Eleventh Circuit applies a non-exclusive four-factor test: (1) "the law enforcement purposes served by the detention, [(2)] the diligence with which the police pursue the investigation, [(3)] the scope and intrusiveness of the detention, and [(4)] the duration of the detention." *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004); *see also United States v. Roper*, 702 F.2d 984, 985 (11th Cir. 1983) ("distinction between an arrest and an investigatory stop depends upon the nature and degree of the intrusion under all the facts of the particular encounter").

The purpose of Quinecia's detention was to assure the safety of the officer, Defendant Lane quickly determined that Quinecia was not the subject of his arrest warrant, there was limited intrusiveness of the detention, and the duration of the detention was at most ten to twenty minutes. Therefore, the court finds that Quinecia's detention did not mature into a full arrest, and the court's Fourth Amendment analysis below will proceed on the basis of a detention and not a false arrest. *See also United States v. Fields*, 178 Fed. Appx. 890 (11th Cir. 2006) (no "arrest" where defendant handcuffed and placed in back of patrol car while officer "checked quickly" (ten minutes) to see if defendant's licenses were valid and if there were any warrants outstanding); *United States v. Hastamorir*, 881 F.2d 1551, 1556-57 (11th

11

Cir. 1989) (fact that individual placed in handcuffs does not convert investigatory detention into arrest); *Courson v. McMillian*, 939 F.2d 1479, 1492-93 (11th Cir. 1991) (ordering suspect to lie face down does not convert detention into arrest). *Compare United States v. Tookes*, 633 F.2d 712 (5th Cir. 1980) (arrest occurred where individual apprehended by detaining him on ground, searched to the point of removing his socks and shoes, placed in police car, and driven five minutes to different location).

Further, despite the conclusory allegations made in her complaint, Plaintiff's factual allegations raise no causes of action with respect to the Fifth, Sixth, or Fourteenth Amendments, either as to procedural due process or equal protection. Nor does her response to Defendants' motion for summary judgment explain how those amendments might be implicated. Plaintiff has further failed to identify any custom or policy that led to the alleged constitutional violations, nor has Plaintiff identified any prior circumstances with Defendant Lane or any other Clayton County deputy that should have put Defendants on notice of deficiencies with their training and policies.

### B. Fourth Amendment

Plaintiff attempts to muddy the waters of her Fourth Amendment claim by labeling it a third-party warrant situation. The record does not support such an assertion. According to the information on the warrant, Dynolis Williams Murphy resided at the address. As it

12

turns out, that information was incorrect, but this is not a third party situation where an informant told a police officer that a wanted individual was at a friend's house, for example.

Under the law in this circuit, an officer is permitted to approach an individual's house and knock on the door when armed with an arrest warrant for that individual. *See*, *e.g.*, *United States v. Bervaldi*, 226 F.3d 1256, 1263, 1267 (11th Cir. 2000) (holding that police officers did not violate a person's Fourth Amendment rights by entering the person's home where the officers had an arrest warrant for a suspect, went to the address that they believed was the suspect's home, believed the suspect was inside the home, knocked on the door, and later entered the house). There, the court held that "[a]lthough searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton v. New York*, 445 U.S. 573, 603 (1980), the Supreme Court held that 'for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which a suspect lives when there is reason to believe the suspect is within.'" *Id.* at 1262-63. In the Eleventh Circuit, courts conduct a two-part inquiry to determine if entry pursuant to a warrant complies with the Fourth Amendment: (1) "there must be a reasonable belief that the location to be searched is the suspect's dwelling and (2) the police must have 'reason to believe' that the suspect is within the dwelling." *Id.* at 1263 (citing *United States v. Magluta*, 44 F.3d 1530 (11th Cir. 1995)).

13

AO 72A
(Rev.8/82)

Here, the warrant had been issued only several weeks before Defendant Lane attempted to serve it. The Sheriff's Office received a call that afternoon from the victim who stated the subject was at the address. The clerk at the Sheriff's Department gave Defendant Lane a list of previous addresses for the subject. When Defendant Lane approached the house, he heard a female voice talking on the phone. For these reasons, the court finds that Defendant Lane's approach to and knocking on the door of the house did not violate Plaintiff's Fourth Amendment rights.

In her briefs, Plaintiff asserts that Defendant Lane made a forced entry in to the home. This assertion, however, finds no support in the record. There is nothing in the record to indicate that Quinecia's decision to open the door was non-consensual. Quinecia, herself, testified that Defendant Lane knocked on the door, Quinecia opened the door, Defendant Lane introduced himself and said he needed to speak with her. Defendant Lane did not have his weapon drawn and he did not speak in a threatening tone of voice. Quinecia did not appear intimidated when she answered the door.

The situation escalated when Quinecia closed the door on Defendant Lane's leg. The question at this stage of the inquiry concerns whether the officer has reasonable concern for his safety enough to justify his limited entry into the home to secure Quinecia. Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain an individual if he has a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *Id.*

14

Such a search "does not violate the Fourth Amendment if the police have reasonable articulable suspicion to justify such a limited detention." *Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997). Further, the court explained above that the limited detention had not escalated to the level of an "arrest" for purposes of the Fourth Amendment.

Here, Defendant Lane testified that Quinecia tried to push him out of the doorway and slammed the door against his leg. He prevented Quinecia from slamming the door, threatened her with the taser, and eventually handcuffed her because he believed she had committed simple assault against him. The court finds, therefore, that Defendant Lane had a "reasonable, articulable suspicion" that Quinecia was involved in some form of criminal activity and therefore could perform a *Terry*-like investigatory stop to assure his safety.

After Defendant Lane had secured his safety with respect to Quinecia and determined that she was not the individual listed on the warrant, Defendant Lane did not search the house but rather used the information given to him both by Quinecia and her mother to determine that although Dynolis Williams Murphy had lived at the house at some point in time, she no longer did. Defendant Lane then waited outside the house with Quinecia until her mother arrived. The interaction between Quinecia and Defendant Lane lasted approximately twenty minutes.

15

There are numerous cases which discuss the applicability of the Fourth Amendment in the context of a warrant served at a wrong address. Plaintiff relies primarily on *Wanger v. Bonner*, 621 F.2d 675 (5th Cir. 1980). In *Wanger*, plaintiffs filed suit against a sheriff and deputies of DeKalb County alleging violations of their Fourth Amendment rights when the deputies attempted to execute a bench warrant for the arrest of Jimmy Leon Payne, and the address listed on the warrant had been the home of plaintiffs for three years. The deputies arrived at the home at 1:30 a.m., and when Mr. Wanger stated he was not the person they were looking for, the deputies told him he would need to produce identification and allow them to search the house for Payne. Although Mr. Wanger agreed to get identification, he did not permit the deputies to follow him from the porch into the house and shoved the deputies back on to the porch. The deputies used some degree of force to enter the home and check for Mr. Wanger's identification. While checking for identification, the deputies thoroughly searched the house and shone a flashlight upon Mrs. Wanger who was undressed at the time and attempting to calm her frightened child. The deputies instructed her to leave the child's room so it could be searched. After completing the search, the deputies arrested Mr. Wanger for simple battery and obstruction of an officer in the performance of his duties. At trial, the jury issued a verdict in favor of the deputies but against the sheriff.

On appeal, the court found that the plaintiffs had provided sufficient evidence from which a jury could conclude that the deputies were acting on the policies of the sheriff.

16

They started their shift at midnight and always went about the task of serving outstanding arrest warrants. The deputies were instructed to always search the premises listed on the warrant if they were told the subject was not home. No attempts were made to verify the correctness of the address on warrants received from other counties. There was testimony at trial that an address on a warrant was incorrect perhaps a quarter of the time.

The court first discussed that the "standard against which the fourth amendment requires that we judge the validity of a search or seizure is one of reasonableness in light of the totality of the circumstances." *See id.* at 681 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109-10 (1977)). The court held that the

> scope of the intrusion constituted a severe invasion of privacy. The intrusion consisted of more than a mere entry into the Wanger residence; the deputies conducted a thorough search of all parts of the home in which an individual could have been hiding and ultimately arrested Niles Wanger because of his ineffective efforts to prevent the deputies' forcible entry.
>
> The manner in which the deputies conducted the intrusion did not serve to minimize any possible infringement of the Wangers' Fourth Amendment rights. No prior attempt had been made to serve the arrest warrant upon Jimmy Leon Payne at a more reasonable hour, and no one in the DeKalb County Sheriff's Office sought to verify the address contained on the out-of-county warrant by checking the phone book or city or county digest. . . . The commission of the intrusion into the Wangers' private residence at night exacerbates the degree of the intrusion.

*Id.* at 681-82. The court continued:

> Generally, the inclusion of the name of the person to be arrested on the arrest warrant constitutes a sufficient description to satisfy the fourth amendment requirement that the person to be seized be described with particularity. See

17

> Fed. R. Crim. Proc. 4(c). That general rule does not apply in this case. The inclusion of an address on a misdemeanor warrant will not suffice to allow a law enforcement officer to conduct a search of the premises located at that address in the middle of the night over the objection of the person residing therein, when that person establishes he is not the suspect named in the warrant, and the officer knows that in approximately twenty to twenty-five percent of similar instances the warrant address is incorrect.

*Id.* at 682.

The court finds that *Wanger* is distinguishable because it related to a misdemeanor warrant, took place in the middle of the night, resulted in a full scale search of the home over the objection of the homeowner after he established that he was not the suspect named in the warrant, and was conducted by an officer who knew that in a quarter of the cases, the warrant address is incorrect. Those are not the facts of the instant case. Here, Defendant Lane attempted to serve a felony warrant shortly before the dinner hour. He did not conduct a full scale search of the home. He did secure Quinecia until he could determine she was not a safety risk to him, but upon learning that she was not the subject of the warrant, Defendant Lane removed her handcuffs and waited outside the house for Quinecia's mother to return. For these reasons, the court finds that Plaintiff has not established a Fourth Amendment violation.

### C. Excessive Force

It is axiomatic that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect

18

it." *See*, *e.g.*, *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

> Determining whether the degree of force used was reasonable requires consideration of the exigencies of the immediate situation and the officers' being forced to make split-second decisions. Additionally, this Court has held that an officer's drawing a weapon and ordering a person stopped to lie on the ground does not necessarily constitute excessive force during an investigatory stop.

*See Jackson v. Sauls*, 206 F.3d 1156, 1171-72 (11th Cir. 2000).

The only testimony of injury that exists in the record is that more than a day after the incident, Tammi took Quinecia to the emergency room to have her thigh examined. The emergency room recommended wrapping the thigh, applying ice, and taking Aleve. There is no set of circumstances under which this is anything more than a de minimis injury. *See*, *e.g.*, *Bryan v. Spillman*, 217 Fed. Appx. 882 (11th Cir. 2007) (de minimis where officer conducted "rough search" of genitals, pushed suspects against car and held head down against car); *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000) (de minimis where officer grabbed arrestee, shoved him a few feet against a vehicle, pushed his knee into suspect's back and suspect's head against the van, searched suspect's genitals in uncomfortable manner, and placed suspect in handcuffs and suspect had only minor bruising which quickly disappeared without treatment). The court grants Defendants' motion for summary judgment with respect to Plaintiff's excessive force claim because Plaintiff has not established a constitutional violation.

19

### D. Remaining Claims

Because the court found no constitutional violation, the court need not consider Plaintiff's claims against Clayton County and Sheriff Victor Hill. *See Best v. Cobb County*, 239 Fed. Appx. 501 (11th Cir. 2007) (per curiam) (where no constitutional violation, plaintiffs' claim against county cannot survive summary judgment). For the same reason, the court declines to exercise supplemental jurisdiction over Plaintiff's state law claims to the extent that any remain. *See* 28 U.S.C. § 1367(c)(3).

### III. Conclusion

The court GRANTS Defendants' motion for leave to file excess pages [22] and GRANTS Defendants' motion for summary judgment [23].

**IT IS SO ORDERED** this 19th day of February 2009.

                                              s/ J. Owen Forrester
                                              J. OWEN FORRESTER
                          SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)